UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MERCHANTS NATIONAL BONDING,
INC.,

Plaintiff/Counter-Claim Defendant,

v.                                           Civil No.: 2:24-CV-01034-JES-NPM

HOFFMANN TIER ELECTRIC, LLC,

Defendant

DAVID H. HOFFMANN, JERRILYN M.
HOFFMANN, and TIER ELECTRIC OF
CENTRAL FLORIDA, INC.

Defendants/Counter-Claim Plaintiffs.

_____/

## FIRST AMENDED COUNTERCLAIM

Defendants, David H. Hoffmann, Jerrilyn M. Hoffmann, Hoffmann Tier

Electric, LLC, and Tier Electric of Central Florida, Inc. ("Defendants") hereby file

their counterclaims against Plaintiff/Counterclaim Defendant, Merchants National

Bonding, Inc. ("Merchants").

### INTRODUCTORY STATEMENT

1.      Merchants' Complaint casts this dispute as arising from a failure by Tier

Electric of Central Florida, Inc. ("Tier") to comply with its obligations as the

1

electrical subcontractor on a project known as IV Bentley Village – Addition and Renovation, Job No. 221092 (the "Project"). That conveniently ignores the real matters in dispute.

2.     First and foremost, Merchants has sued under the wrong contract. Merchants has sued for recovery of amounts due under a general indemnity agreement ("GIA") related to amounts that Merchants paid under a performance bond and a payment bond.  Those bonds secured Tier's performance under its contract with Suffolk Construction Company, Inc. ("Suffolk").  But the repayment obligations under the two bonds were redefined by a promissory note between Tier and Merchants ("Promissory Note").  Merchants specifically represented to Tier that the purpose of that Promissory Note was to govern the terms of repayment under the GIA, which were not defined under the GIA.  Merchants is suing under the GIA while completely ignoring the terms of the Promissory Note.  Effectively, Merchants is improperly seeking to accelerate the repayment of the Promissory Note without having any grounds to do so.

3.     Second, the amount due under the Promissory Note is itself in dispute. At the core of this dispute — the real dispute, not the simplified version presented by Merchants — is the bad-faith insistence by Merchants that Tier execute a settlement agreement with Suffolk and Merchants under which Merchants paid Suffolk over $1.8 million and Tier gave up its right to $1.4 million owed by Suffolk to Tier ("Settlement Agreement").  Tier agreed to execute that settlement but fully reserved its rights to proceed against Merchants.  Tier was not in material default under its

contract with Suffolk and, thus, no amount was owed by Merchants under the bonds with Suffolk. Merchants' payments to Suffolk were in fact *ex gratia*. Further, the forfeiture of amounts due from Suffolk to Tier was a separate *ex gratia* payment from Merchants to Suffolk, which offsets amounts Merchants claims are due under the Promissory Note.

4.    Merchants compounded the problem with the Settlement Agreement further by ignoring the scope of work specified in the agreement and insisting that Tier perform additional work that was not required - all so that Merchants could avoid getting into a fight with Suffolk over work it was not entitled to receive from Tier. Because of that additional work, Tier was unable to finish its work within the timeframe contemplated by the Settlement Agreement, and Merchants ended up paying $500,000 in delay damages that were caused by the addition of work that was beyond Tier's scope, as well as by delays attributable to other parties or to Suffolk itself. Merchants caved into the demands made by Suffolk because it planned to attempt to shift all resultant liability onto Tier and bill Tier for them under the GIA and Promissory Note.

5.    Merchants' bad-faith insistence that Tier settle with Suffolk, its unjustified payments to Suffolk under the bonds on the project, and its agreement with Suffolk that Tier was in material default on the project while simultaneously acknowledging to Tier, correctly, that there was no material default, destroyed the Tier business. Accordingly, Tier seeks declaratory relief that no amounts are due

under the GIA or the Promissory Note and seeks damages for the full value of its now destroyed business.

## THE PARTIES

6.     At times relevant to this action, Tier was an electrical subcontractor based in the greater Naples, Florida area, among other locations. It is a limited liability company.

7.     Merchants is an Iowa corporation with its principal place of business in West Des Moines, Iowa. Merchants is authorized to do business in Florida.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs and is between citizens of different states.

## FACTS COMMON TO ALL COUNTS

**A.     The Acquisition of Tier and Its Employment of Williamson**

9.     Defendant David H. Hoffmann ("Hoffmann"), an entrepreneur and business executive, is one of the principals of a family of companies which operate in sectors ranging from agriculture to hospitality & entertainment to real estate.

10.     Defendant Jerrilyn Hoffmann is the wife of David H. Hoffmann and one of the other principals of the Hoffmann family of companies.

11.     In February 2020, Hoffmann Tier Electric LLC acquired a majority position in Tier from Doug Nelson. At that time, Tier was a modest-sized

commercial electrical contractor with approximately 70 employees and $9.25 million in annual revenue.

12.     Mr. Nelson retained an interest in the company and stayed on as its President until January 2021. About that time, John Williamson ("Williamson"), who had joined Tier in July 2019, became Tier's President and Operations Manager. As an officer of Tier, Williamson owed Tier fiduciary duties.

13.     Williamson's compensation included a base salary and opportunity for additional pay if Tier achieved certain gross revenue targets under his leadership. At all times, however, Williamson's duty was to serve as a steward of Tier's long-term success, to return value to its shareholders.

**B.    The Moorings Park Project**

14.      In or about Fall 2019, Suffolk offered Tier an opportunity to bid on a project known as Moorings Park Town Center ("Moorings Park").

15.     The scope, and therefore value, of the electrical work required at Moorings Park substantially exceeded Tier's ability to obtain bonding required by Moorings Park's owner.

16.     Suffolk and Williamson, faced with the impossibility of Tier bonding an original contract valued at more than $500,000, entered a collusive relationship that served their respective interests at Tier's expense.  They agreed to obfuscate the value of the contract by artificially reducing it to $400,000 (an amount for which it would be unnecessary for Tier to obtain a bond) and then, approximately one week after entering that nominal agreement, entered change orders totalling approximately $2.8

million, thereby raising the total value of the contracted services to approximately $3.2 million.

17.    The purpose and effect of this collusion was *not* to advance Tier's interests by enabling it to undertake the work at Moorings Park.  Instead, Suffolk and Williamson sought to, and they did, begin a relationship to advance their respective interests over Tier's need for profitable work.

18.    Specifically, Suffolk and Williamson agreed that, in return for Suffolk's cooperation structuring the Moorings Park work to help Tier avoid the need to bond its true value, Williamson would ensure that Tier would undertake the electrical work at a future Suffolk project at substantially reduced rates, thereby expanding Suffolk's profit.  Under the agreed arrangement, Suffolk would, in turn, ensure that project also benefited Williamson personally.

19.    Suffolk and Williamson further agreed that Williamson would cause Tier to forfeit over $1 million of the nominally agreed change orders for Moorings Park, thereby benefiting Suffolk at Tier's expense. No legitimate business interest or valid business judgment justified that forfeiture by Williamson of Tier's right to payment for work performed.

20.    Instead, by under-charging Suffolk through the artifice of failing to invoice change orders, Williamson sought to curry favor with Suffolk for another project, which would further benefit himself at Tier's expense.

**C.    Acquisition of Tier**

21.    On February 19, 2020, Hoffmann Tier Electric, LLC closed the acquisition of a majority interest in Tier Electric.  The purchase price was calculated on the basis of a 100% interest in Tier having a value of $3,107,415.

**D.    The Bentley Village Project**

*(i)    The Project*

22.    Bentley Village is a senior living community in Naples, Florida.  In 2021, Suffolk undertook the general contractor work for a substantial renovation and expansion of Bentley Village, with the work to be performed in several phases.

23.    Williamson had anticipated that Tier would be awarded the contract, but was subsequently told by Suffolk that he would have to make a bid.

*(ii)    The Bidding Process and Collusion Resulting in an Unprofitable Contract.*

24.    Tier tasked its employee, Mark Johnson, with determining the amount to bid for the electrical work at Bentley Village.

25.    Based on a thorough review of the project, Mr. Johnson compiled a bid in the amount of approximately $5.4 million.  This figure included an estimated 10% profit for Tier, which was a customary target profit margin for such jobs in the Naples market.

26.    When Suffolk did not immediately approve Tier's bid, Williamson claimed to Tier personnel that he would follow up with Suffolk.  According to Williamson, Suffolk responded to his inquiry by claiming it had received a bid from another electrical contractor in the amount of approximately $4.8 million, and it insisted that Williamson reduce Tier's bid to $4.7 million if it wanted to be awarded

7

the contract. Suffolk's claim was false. Tier's $5.4 million bid was the lowest received. Tier was subsequently informed by former Suffolk employees that the other bids on the project were in excess of $6 million.

27.    Williamson had no basis for second-guessing other electronical contractors' bids. Williamson knew his competition to be capable electricians with substantial experience bidding commercial projects similar in scope to Bentley Village.

28.    Another senior Tier employee, David Desch, who at the time was a Service Manager, explained to Williamson why a $4.7 million contract for electrical work at Bentley Village would be untenable for Tier. The $700,000 reduction would *exceed* the $540,000 profit (i.e., 10% of $5.4 million) contemplated by Tier's bid, meaning that Tier would lose money on the contract even if the job otherwise went to plan, without Tier incurring unanticipated costs.

29.    When Williamson inexplicably failed to acknowledge that agreeing to accept a mere $4.7 million for the Bentley Village project was not in Tier's interest, Mr. Desch escalated the concern to Tier's owners. Unfortunately, despite admonitions by Mr. Desch and others that Williamson should not agree to this unprofitable undertaking, he signed the $4.7 million contract with Suffolk on July 26, 2021, just two hours before Hoffmann transmitted his directive to Williamson that he reject that price. A copy of the agreement between Suffolk and Tier (hereinafter the "Subcontract") is attached as **Exhibit 1**.

30.    Unbeknownst, at that time, to other members of Tier's management or owners, Williamson agreed to the $4.7 million contract because, while obviously not in Tier's interest, it served his personal interests.

31.    In connection with his promotion to President and Operations Manager, Williamson had claimed that, under his leadership, Tier would generate $10 million in gross revenue in 2021.  By the middle of that year, however, Tier had generated only about $600,000 in gross revenue.  Williamson came to believe that he would be fired if he failed to dramatically boost gross revenue before the end of the year.  Williamson believed it was in his self-interest for Tier to undertake the Bentley Village project for $4.7 million, even though that contact would likely result in a substantial net loss for Tier, because Williamson thought his performance would be evaluated against his stated ability to generate $10 million in gross revenue.

32.    Williamson's fidelity to Tier's interests was further compromised by entering a collusive kickback arrangement with Suffolk, under which Williamson was rewarded for elevating Suffolk's interests over Tier's.  Specifically, Williamson and Suffolk agreed that that Suffolk would pay Williamson 10% of the difference between Tier's original $5.4 million bid and the $4.7 million contract.  Suffolk and Williamson thereby established an arrangement in which they profited from Tier's loss.

33.    Suffolk knew that, by agreeing to the $4.7 million contract and $70,000 kickback scheme, Williamson would breach his fiduciary duty to Tier.

34.     Suffolk assisted and encouraged Williamson to breach his fiduciary duty to Tier by incentivizing the breach with the promise of a 10% kickback.  Suffolk further assisted and encouraged Williamson to breach his fiduciary duty to Tier by not disclosing the kickback arrangement to other members of Tier's management or owners.

### (iii)    *The Issuance of the Merchants Performance Bond and the Payment Bond*

35.     On or about September 8, 2021, Tier applied for bonding through Merchants that would enable Tier to undertake the Bentley Village project. On or about September 9, 2021, Tier executed a General Application and Agreement of Indemnity Contracts Form (the "General Indemnity Agreement" or "GIA," a copy of which is attached as **Exhibit 2**).  On or about September 24, 2021, Merchants issued a Subcontract Payment Bond ("Payment Bond") and Subcontract Performance Bond ("Performance Bond"), copies of which are attached as **Exhibit 3**, each in the penal sum of $4,742,000.  Subsequent to the Moorings Park project, the ownership of Tier Electric had changed and a guaranty was provided that enabled the issuance of the bonds at that penal sum.

36.     Under the Performance Bond, Tier is the "Principal," Suffolk is the "Obligee," and Merchants is the "Surety."  Section 2 of the Performance Bond states: "If the Principal performs the Subcontract, then this bond shall be null and void; otherwise it shall remain in full force and effect."  Section 4 of the Performance Bond states: "Whenever the Principal shall be, and is declared by the Obligee to be in default under the Subcontract, with the Obligee having performed its obligation in

the Subcontract, the Surety may promptly remedy the default . . . ."  Under Florida law, the Surety and Merchants were obligated as a matter of good faith and fair dealing not to declare Tier in default unless it was in fact in default under the Subcontract.

### (iv)    Tier's Termination of Williamson and Suffolk's Immediate Response

37.    Williamson's deficient performance as Tier's President and Operations Manager was evident from the moment he caused Tier to contract with Suffolk for the Bentley Village project.

38.    Shortly after learning Williamson signed the Bentley Village contract, Tier undertook a review of his performance. As a result, Tier relieved Williamson of his duties effective October 28, 2021.

39.    The next day, October 29, 2021, Williamson disclosed to Suffolk that Tier had installed conduit of a lower grade than required by the contract specifications.  The facts and reasonable inferences from them support the inference that this was an attempt by Williamson to retaliate against Tier for terminating his employment.

40.    The decision to install Schedule 40 conduit instead of the specified, more costly Schedule 80 was, however, made by Williamson alone.  No other Tier employee or member of Tier's management team would have knowingly undertaken or permitted such non-compliant performance.

41.    Williamson's decision to use sub-par conduit was an attempt to obfuscate from Tier's ownership his wrongdoing in entering the unprofitable Bentley

Village contract.  By saving money on materials, Williamson sought to reduce Tier's losses on the project in the short term, without regard to the likely negative effects on Tier's reputation and its cost to install replacement conduit that complied with the contract specifications.

42.    Suffolk knew or should have known about Williamson's use of Schedule 40 conduit because they had representatives walking the site and it was clearly marked Schedule 40.  Upon information and belief, Suffolk did not complain about the non-specification material before Williamson's termination because Suffolk benefited and expected to continue to benefit from its collusive relationship with Williamson, and the use of lower-grade conduit did not affect Suffolk's profits.

43.    After Suffolk lost Williamson as a dishonest servant due to his termination, Suffolk demanded, for the first time, that Tier comply with the owner's specifications by ripping out the Schedule 40 conduit and replacing it with Schedule 80.

44.    Tier replaced the conduit at a cost of approximately $360,000, an additional expense caused by Williamson's breach of duty and Suffolk's collusion with Williamson.

*(v)    Suffolk's Efforts to Deprive Tier of Compensation*

45.    For most of the year 2022, Tier performed its obligations under the Subcontract Agreement without unusual incidents.

46.    Suffolk paid its contractors, including Tier, under an invoicing portal, Textura, in which Tier would upload its billings for work completed each month for

payment by Suffolk.  Suffolk would then review the bills and either agree that the work had been completed, as stated by Tier, or contest the billing.  Tier was then required to submit two additional items before payments would be made: (i) an updated change order log, which Suffolk would acknowledge had been received but did not approve as part of the payment process, and (ii) lien releases with respect to all Tier's suppliers for the month billed.  Following those submissions, Suffolk would pay the uncontested amount net of "retainage" — an amount kept as a deposit until Tier's work on the project had been completed — and the contested balance was then rolled over to the next month, or months, until Suffolk agreed that the work had all been completed in full at which point the remaining balance on the bill would be paid.

47.    Before submitting any of its bills through Textura, Tier conducted walkthroughs of the project with the Suffolk site manager.  The amount of work that had been completed, and for which payment was due, would be agreed and Tier would then submit a pay application in the agreed amount.  Despite Suffolk acknowledging that a pay application was appropriate in the amount agreed on site following a walkthrough with a Tier representative, Suffolk consistently, and without justification, reduced the amount to be paid on the Tier pay applications.

48.    Following the November 2022 billing, the unpaid balance on the bills was $522,273.64, comprising unpaid bills of $314,219.29 from September, $126,638.04 from October, and $81,416.31 from November.  Suffolk did not have a good-faith basis for denying payment of the $522,273.64, and by doing so Suffolk put

13

Tier in the position of not being able to pay its subcontractors on the project or to manage the cash flow required for the company to continue operating. *Suffolk was therefore in material default of its obligations under its contract with Tier*. The cash flow was exacerbated by the fact that Tier had to pay its subcontractors immediately in order to file the paperwork required for Suffolk to release payments (that is, to avoid the subcontractors' filing liens for completed work), but Suffolk was not timely approving the bills related to those subcontractors.

### *(vi)    Suffolk Threatens to "Bury" Tier Electric*

49.    Sometime in November 2022, Tier put a lien on the property involved in the Moorings Park Town Center project related to the retention that Suffolk had not paid Tier. Sometime thereafter, Suffolk's general counsel, Juan Diaz ("Diaz") phoned Mr. Desch and told him that "you have opened a can of worms, we will bury Tier Electric."

50.    Because Suffolk was over four months past due on its payment obligations and thus in material default on the Subcontract, Tier faced severe financial strain and stopped all work on the Bentley Village project on or about November 18, 2022, until such time as Suffolk cured its default. Notwithstanding Suffolk's continuing non-payment and default, Tier elected to return to work on or about November 25, 2022. Tier nonetheless met all its performance metrics under its contract with Suffolk.

51.    On December 19, 2022, Suffolk issued a letter captioned "Notice of Default and Obligee's Claim Against the Performance Bond." The notice ignored

the fact that Suffolk itself was in default due to its failure to make payments for services rendered, as Tier advised Suffolk in a letter from its counsel, Edward Ruberry, to Diaz, dated December 23, 2022.

### (vii)   *Merchants Gets Involved*

52.     Around this time, Tier entered into discussions with the Merchants representative, Chris McElroy ("McElroy").  Tier advised Merchants that the problems at the project related to cash-flow issues resulting from Suffolk's delays in payment.  Tier also advised of the project underpricing because of Suffolk's kickback to the former Tier president, Williamson.  Merchants had no interest in Tier terminating the contract because it feared Suffolk would seek to impose on Merchants responsibility for the work stoppage, responsibility that ultimately rested with Suffolk for its non-payments and delays unrelated to Tier.

53.     To keep Tier involved in the project and mitigate the loss that it feared Suffolk would seek to impose under the bonds, Merchants proposed on January 9, 2023, to provide financing to allow Tier to complete the work notwithstanding Suffolk's continuing refusal to pay Tier.

54.     On January 27, 2023, Diaz advised McElroy at Merchants that "Suffolk has been issuing joint checks to Tier's lower tier subcontractors, suppliers and vendors . . . since there remains a significant number that are unpaid."  The letter ignored the reality that, although the "lower tier subcontractors" were being paid, Suffolk's continuing non-payment of amounts due to Tier meant Tier had continuing financial difficulties and could not pay its own payroll.  The letter asserted

$826,069.29 in payments to subcontractors in excess of the amounts that were due to Tier for completed work as well as $730,000 in liquidated damages, $725,712 in "general conditions," and an estimated $850,000 cost to complete the project through Phase II, for a total of $3,131,781.29 in damages claimed by Suffolk from Merchants. No justification was provided for the conclusory statements of liquidated damages and "general conditions" damages at that time, nor did Suffolk at any subsequent time ever provide Tier justification for those amounts.

55.     On February 6, 2023, Diaz of Suffolk wrote to McElroy at Merchants stating that the "Owner of the Project" had serious concerns "that Tier Electric of Florida will not be able to complete its work because of its deteriorating financial condition." McElroy subsequently told Mr. Ruberry that the owner of the Project was upset with Suffolk over delays with the project and that Suffolk was using Tier as the scapegoat for Suffolk's problems. Merchants' view was that although Tier had some involvement in the project delays, Suffolk itself and Suffolk's other subcontractors were principally responsible. However, in Merchants' view, because Suffolk had used Tier as the scapegoat in conversations with the Project owner, Suffolk needed to get Tier off the project.

56.     The letter enclosed a bid from Community Electric of Collier, Inc. for the work associated with Phase II of the project. The total forecasted amount to complete the project was $1,445,845.86.

57.     On February 7, 2023, Suffolk sent Merchants a follow-up letter that included a revision to the Community Electric bid to replace Tier on Phase II and a

16

second bid from Bright Future Electric.  The bid from Bright Future Electric to complete the remaining electrical scope was $1,736,770.46.  The revised bid from Community Electric was for $1,441,206.66.

58.    On February 9, 2023, Cameron Pritchard, a consultant with J.S. Held, who was brought in by Merchants to assist with the Tier-Suffolk dispute, visited the Bentley Village job site.  Mr. Pritchard stated that he believed Tier was in a positive position with his concerns being material lead times.  He further stated that there was more than adequate manpower in the project.  He stayed for the walk through for Phase II of the project.  Mr. Pritchard asked Suffolk for the project schedule and was told they would send it to him via email, which Suffolk never did.

59.    McElroy assured Tier that it would work hand in hand with Tier to assure that Suffolk did not take over the project and kick Tier off.  At this point, McElroy was stating that Suffolk was seeking to create a false narrative to go after both Merchants and Tier for damages.

60.    On February 14, 2020, Ben Wilson of Suffolk emailed Mr. Desch stating: "The commitments we discussed on Friday 2/10 have not been met.  The manpower commitments made to Suffolk, the Owner, and J.S. Held on Friday were significant and as of this point the majority of work available to Tier is not underway."  These statements were false, as Mr. Desch made Suffolk aware of at the time.  The commitments had been met, and the manpower was adequate.  Mr. Wilson claimed a list of 100 open items to be addressed, yet Sam Doran of Suffolk

emailed Mr. Desch the same day with a list of only 11 items to be completed by Monday, February 20.

61.    On February 14, 2023, Tier passed the Electrical Final Inspection at the PT Building**.** Tier was the first trade in the PT Building to final out its permit.  None of Suffolk's other subcontractors had even scheduled their inspections at that point.

62.    On February 15, 2023, AHCA inspected the BCC building again, following up on the notations left from the previous inspection.  Tier Electric and its subcontractors passed.  However, the Inspector and the Engineer of Record for the project debated the inclusion of individual circuit surge suppression, which was not included on the drawings.  The inspector was requiring it then and indicated it would pass the project if they were installed by the close of business Friday.  Suffolk asked for Tier to assist them in getting this done as a change order to bail them out, which Tier agreed to do upon Suffolk supplying a signed change order.

63.    On February 16, 2023, Mr. Pritchard attended another walk-through with Tier Electric and Suffolk.  During the walk-through Suffolk contended that Tier Electric ordered the wrong Type H fixtures for the PT Building.  It was determined during the walk-through that contention was false, and Tier had ordered the correct fixtures.  Suffolk additionally contended that Tier was deficient in installing the lighting in the courtyard areas.  It was determined that the landscape lighting was not part of Tier Electric's scope and belonged to the Landscape Subcontractor.  Mr. Pritchard stated multiple times during this site visit that Suffolk was being overly difficult and seemed to have an ulterior motive behind their actions.  Mr. Pritchard

asked for the project schedule again.  Again, he did not receive it.  He stated to Tier Electric's team that Suffolk was trying to hide the project schedule and manipulate the workflow.

64.     On February 20, 2023, Mr. Desch wrote to McElroy and summarized the state of play as follows:

> We have had numerous exchanges of information with your consultant, Cameron Pritchard, and understand that he is satisfied that any delays on the project are not due to shortfalls in the performance of Tier Electric.  If there are any issues that you believe give Suffolk some ground for tendering for a replacement for Tier Electric, please advise as soon as possible.  From our perspective, we are satisfied that we have performed as required.  Given the extensive exchange of information with Cameron, I will not repeat all the points covered in that correspondence, and why our performance is as required.  The problems on the project are largely due to issues with other contractors, perhaps with Suffolk itself, and with third-party suppliers over which Tier Electric has no control (such as the delay in receipt of the generator, a Covid-related delay relating to the supplier itself, effectively a matter of force majeure).  We understand that Cameron agrees with our assessment.
>
> Accordingly, we continue to oppose any effort to tender Phase II-V of this project to another contractor as not being justified, and oppose any claim that Suffolk seeks to make on the surety bond.

65.     Suffolk continued to put pressure on Merchants to tender the Tier Electric contract to another party.  Merchants recognized that the request was unjustified.  McElroy stated that Suffolk was claiming to have difficulties with the project owner, who was threatening to replace Suffolk. McElroy speculated that Suffolk has made Tier Electric a scapegoat in its discussions with the owner. McElroy's own assessment was that the delays in the project were largely due to other subcontractors and to Suffolk itself.  He stated that the previous delay when

19

Tier stopped work had been cured.  He had asked Suffolk whether, if Merchants took over from Tier Electric, Suffolk would waive the alleged delay damages.  Suffolk had said no.

66.    On February 23, 2023, Mr. Pritchard attended a meeting with subcontractors.  It became clear that Suffolk was intentionally using an out-of-date spreadsheet without the most current information in order to put Tier in a bad light. Mr. Pritchard's expressed view was to the contrary: Tier Electric was performing well on the project, hitting its scheduled metrics, and that Suffolk was an "ass for no other reason but to be an ass."

67.    On February 24, 2022, McElroy advised Mr. Ruberry that before Merchants would move forward in its discussions with Suffolk over a resolution of the matter, it required a signed promissory note from Tier:

> Thank you for the call today. As we discussed, Suffolk is demanding that we perform under the bond.  We have two reasonable options to explore, one of which is having Tier complete phase 2.  I have attached the promissory note from January 31.

68.    On February 25, 2023, McElroy and Mr. Ruberry spoke on the phone:

- McElroy stated that he had spoken with Ben Wilson at Suffolk who had indicated that Suffolk thought Tier's performance was terrible — the worst electrical contractor they had ever seen.  Based on the constant reports from Mr. Prichard, McElroy knew this was false.

- McElroy indicated that Suffolk had received a material default notice from the owner of the Bentley Village project because of delay, and that

Suffolk was blaming Tier for the problem. McElroy indicated that this was the usual pattern when the general contractor was in trouble with the owner — the general contractor points the finger at someone else, in this case Tier, and blames them. McElroy never asked for and never received confirmation that the owner made such a threat.

- McElroy told Suffolk that in Merchants' view Tier was not responsible for the delay. At most Tier was one of several factors. Tier had been performing and was almost done with Phase I. Suffolk disagreed, indicating that they had no confidence in Tier's ability to complete the project, pointing to Tier being in financial difficulties and having inadequate supervisory staff. McElroy pointed out that Merchants had taken care of the cash-flow concerns and could throw resources at the project as necessary, including if needed a supplemental contractor to work with Mr. Desch.

- Suffolk and Merchants had discussed a possible monetary deal to resolve the problem. McElroy thought the difference was around $200,000 between what it would cost for Tier to finish Phase II and the tenders that Suffolk had to replace Tier, which would likely involve paying $1.5 million for a substitute. Suffolk was also claiming delay damages.

- McElroy thought it possible that Suffolk would seek to terminate Tier's contract. He stated that Merchants would view the termination as being improper. He also thought Merchants had exposure to Suffolk seeking delay damages, and that any damages the project owner sought to impose on Suffolk, Suffolk would seek to recover from Tier. They were also seeking $750,000 of "general conditions" damages. McElroy thought a worst-case position of Suffolk's total claim would be $1.7 million and a best-case scenario of $1.15 million.

- McElroy indicated that the best viable option to complete Phase II was to use Tier, and he expressly stated that Merchants did not think there was a material default. He did not think Suffolk's demand that Merchants do something to cure a default was correct because Tier was not in default — Tier was performing. Tier had cured any issue caused by the work being stopped in December 2022.

- McElroy also stated his belief that the reason Suffolk was pressing having a tender for the completion of Phase II so badly was that they had issues with the Project owner. He thought Suffolk had promised the owner to get Tier off the job, get another electrical contractor on the job, and then accelerate work and make up time on the schedule.

- McElroy then indicated that his "mandate" and proposition to Tier was to negotiate the best deal that could be struck with Suffolk to get

everyone out of the project, to release the bond and to release Tier from any further expenses. But that, if they went there, they would want a promissory note executed and signed.

- Merchants did not want Tier involved in Phase II because it did not want to risk additional exposure for its consulting, legal fees, or delay damages. They wanted to cut their losses, which they thought could be much higher. McElroy said he didn't think any of this was a good option for Tier, that that was where they were at because Phase II started March 6.

- Mr. Ruberry noted that Suffolk had a weak case to throw Tier off the project and asked what Merchants was looking for in a promissory note.

- McElroy stated that the promissory note was for all losses and expenses. He stated that he had always used a promissory note to cash out the repayment plans and that if the principal meets all obligations in the repayment plan, it waived interest and sets up the parameters for how much was repaid and when. He noted that the GIA doesn't touch on repayment terms — it doesn't touch on how much needs to be repaid or when. So, McElroy used a promissory note to address those points.

- McElroy again stated that Tier was performing on its contract. Merchants did not believe Tier was absolutely scot free of any kind of liability and that as far as delay goes, they do have some responsibility for the delay. But a lot of it was "concurrent."

- Mr. Ruberry summarized the options as he understood McElroy was stating them to be that Merchants supported Tier, which would eventually result in a lawsuit, or that Tier and Merchants cut a deal now with Suffolk, in which case Suffolk was looking for about $2 million.

- McElroy responded that one scenario was that Suffolk was really bluffing — Suffolk had no plans to actually terminate the Subcontract and require that Merchants provide substitute performance from a different contractor. If Suffolk did that, then they would likely withhold all payments to Tier and try to do a walk away. McElroy said that, if that's how things played out, he was fine with that, provided there was a promissory note in place. McElroy indicated flexibility about the repayment terms.

69.    Tier's risk mitigation strategy at this time was to litigate against Suffolk for Suffolk's default in paying amounts due to Tier, but otherwise to stay on the project and complete the work it was contracted to do. Merchants, in contrast, while acknowledging that Tier was not in default, was exploring an alternative risk

mitigation strategy in which it would make a cash settlement to Suffolk and someone else would do the remaining work that Tier was contracted to perform.

70.     In fact, Merchants' push to get the promissory note in place was intended to provide assurances to its management that repayment terms had been resolved as a precursor to Merchants having settlement discussions with Suffolk. Merchants needed Tier because it would be less expensive for Tier to finish the work than to have a new contractor replace Tier — as proved to be true. Merchants believed that with repayment terms agreed, it could agree to whatever was expedient for its interests without regard to Tier's interests.

71.     On February 27, 2023, Suffolk demanded to take possession of all uninstalled lighting fixtures and switchgear on the project.  Tier Electric decided to do an inventory with a representative from Suffolk to come to an agreement on what is stocked within its connexes.  Suffolk sent two people from Community Electric to perform the inventory.  Suffolk/Community Electric refused to have a representative from Tier Electric involved in taking inventory.  In a call between Mr. Desch and Dan Raglow, Mr. Raglow instructed Tier Electric to allow Community Electric to perform the inventory and not to push being involved.

72.     On February 27, McElroy emailed Mr. Ruberry regarding the promissory note, stating: "The promissory note is to accommodate payment terms for Tier to repay Merchants for any losses we incur per Tier's and Mr. and Mrs. Hoffman's [sic] obligations under the GIA."

73.     On March 2, 2023, Mr. Pritchard attended a meeting of subcontractors. Mr. Pritchard told Mr. Desch that Tier was performing well on the project and hitting its scheduled metrics.

74.     As part of Suffolk's continuing campaign of deceit and false allegations to create fake issues to unjustifiably push Tier off the Bentley Village project, on March 3, 2023, Diaz sent a letter to Tier and Merchants captioned "Demand to Deliver All Materials and Equipment." The letter directed Tier to "deliver all material and/or equipment purchased in connection with the above-referenced project to the site on Monday, March 06, 2023" and further demanded an inventory manifest within 24 hours of the letter of all such materials in Tier's possession.  The letter asserted that the failure to comply with the demand would be a breach of the contractor agreement between Tier and Suffolk and of the Performance Bond with Merchants.

75.     Mr. Desch responded to Diaz on March 3 stating: "All material that Tier has purchased and has been paid for by Suffolk is currently on the jobsite. These items were billed for as stored material and verified by Suffolk personnel through provided invoices, photos and visual inspections."

76.     Josh Christiansen of Suffolk responded to Mr. Desch on March 3: "If anything has been turned over to Suffolk or the Owner, please provide signed acknowledgments or any other documentation of receipt and turnover to us."

77.     Mr. Desch had a conversation with Mr. Raglow of J.S. Held and advised him: "Pursuant to our conversation I am sending Juan Diaz and Suffolk the

26

procurement logs for the lot gear and fixture packages." Mr. Desch then emailed

Diaz: "Pursuant to my conversation with Dan Raglow I am sending you the last

Procurement Logs for the Lot Gear and Fixture packages. I am prepared to

surrender these items to Suffolk on Monday no later than 10 AM. Please advise a

location in which we will transfer the items to Suffolk for storage."

78.    On March 3, 2023, an attorney representing Tier, Marvin Mohn,

emailed McElroy the executed Promissory Note, a copy of which is attached as

**Exhibit 4**.

79.    On March 6, 2023, Mr. Desch wrote to Diaz:

> Per Tier Electric's conversation with Chase Hilderbrand on site at Bentley
> Village at 8:05 AM, Tier Electric is prepared to transfer possession of the
> balance of Switchgear and Fixture to Suffolk.  As discussed, the items reside
> within Tier Electric's rented connex.  Tier Electric has manpower on site to
> assist in the documenting of items for the transfer.  If easier for Suffolk, Tier
> Electric is willing to transfer the rental of the two connex as of this morning to
> ease the transfer and subsequent storage.  Chase Hilderbrand stated he would
> get back to Tier Electric with information on how to proceed when he has it
> himself.

80.    Suffolk continued its efforts to create a false narrative purportedly

justifying termination of the Tier engagement.  On March 6, 2023, Ben Wilson of

Suffolk responded to Mr. Desch that the "information you have provided (attached)

does not satisfy Suffolk's demand for a verified inventory of materials."  After

speaking with McElroy and Mr. Raglow, Mr. Desch responded that "Tier Electric

has met the requirements as asked on March 3rd. All such materials were on site by

10AM and made available to Suffolk. However, Suffolk personnel was not prepared

to accept the material by 10AM and, as of the writing of this email, has made to [sic]

attempt to receive the aforementioned material." Mr. Desch continued to make

Merchants and its agents aware of all these developments.

81.    On March 7, 2023, Mr. Wilson emailed Mr. Desch to advise that

Suffolk had "hired a 3rd party to document and inventory the (3) con-x boxes that

are located on site."  He then emailed Mr. Desch separately to complain about

incomplete items.  On March 8, 2022, Mr. Desch responded to Wilson with an

update on each of the items, to the effect that each of the issues related to problems

caused by Suffolk or other contractors.

### (viii)   *Merchants caves in to Suffolk's demands without justification.*

82.    During a phone call on March 6, McElroy explained that Merchants

was going to negotiate a deal with Suffolk.  He commented on how appreciative he

was of how much Tier had stepped up and worked so hard to get the project to a

good point, but that Suffolk was "insufferable" and "unwilling to work together on

any level."

83.    On March 9, 2022, McElroy called Mr. Desch for an "off the record"

call on a potential settlement.  McElroy indicated that Merchants wanted to broker a

deal to resolve matters.  The starting point on that deal would be that Suffolk

appeared to have decided to replace Tier regardless of the circumstances, effectively

because Suffolk had blamed Tier in discussions with the Project owner for all the

problems with the project and needed to replace Tier to save face with the owner. Per

McElroy, the deal under discussion would involve a three-party agreement amongst

Suffolk, Merchants, and Tier.  The terms McElroy contemplated were that

Merchants would pay Suffolk between $1.0 and $1.7 million to allow another contractor to take over Phase II and that Tier would forego amounts due from Suffolk. Suffolk never provided Merchants with any documentation to support the purported threats made by the Project owner.

84. On March 13, 2023, Mr. Mohn wrote to McElroy, advising that the proposed settlement with Tier "surprises us, particularly since Suffolk does not have the right to push Tier Electric off the project, a point that we had understood you and your consultant agreed with. As you will appreciate, any such settlement will have a severe impact on Tier Electric's interests."

85. Suffolk continued its efforts to manufacture issues to attempt to justify putting Tier off the project. On March 14, 2022, Mr. Wilson of Suffolk emailed Mr. Desch, McElroy, and others with a litany of manufactured concerns. Then on March 15, Suffolk demanded that Tier have a night crew installing exit signs. Mr. Raglow called Mr. Desch asking for a crew to come back to the site as they had already left for the day. Mr. Desch argued that Suffolk was engineering issues and making it virtually impossible for Tier to perform adequately do to this. Mr. Raglow agreed and stated that Suffolk was trying to derail progress and that their demands were not reasonable but asked for Tier to meet them anyway. Tier sent 9 men back to the project and they worked until 22:00.

86. On March 15, 2023, a meeting was held with Messrs. Ruberry, Mohn, McElroy, and Desch and Dawnell Bivens of Tier. McElroy gave a lengthy blow-by-blow review of the discussions between Merchants and Suffolk. They discussed the

29

fact that the case appeared to be headed to very messy and expensive litigation amongst Tier, Merchants, and Suffolk. McElroy didn't believe the numbers being claimed by Suffolk, but he was concerned about potential damages in excess of the penal limit in the bonds, and that Suffolk had threatened to terminate the contract with Tier for cause if an agreement could not be reached with Merchants. McElroy never identified a basis for such termination. McElroy was advised that Suffolk had obtained the bid from Tier by bribing Tier's former president, Williamson, to which McElroy responded suggesting such conduct was not uncommon. On Tier's performance, McElroy stated that Tier "has done everything they can at this point." He further noted that there may be delay but that it was concurrent with other parties. McElroy made it clear that Merchants believed settlement was necessary for Merchants' own financial interests and, even though Tier was not in default and Suffolk was not entitled to terminate the Subcontract, Merchants would still seek to settle.

87.    On March 15, 2023, McElroy phoned Mr. Ruberry and left a voicemail. He advised that Suffolk was putting enormous pressure on Merchants to cave in to Suffolk's demand that Tier be kicked off the job for Phase II. Suffolk was also demanding that Merchants pay an additional $1 million dollars to the new electrical contractor to finish Phase II. Suffolk was also demanding that it be allowed then to proceed against Tier for approximately $500,000 due to delays caused in Phase I.

88.    On March 16, 2023, Mr. Pritchard of J.S. Held attended the subcontractor meeting. That same day a life safety inspection occurs in which the

fire marshal tests the generator.  After the meeting Cameron stated that Tier was

progressing well.  He further stated that Merchants wanted to reward Tier's

employees' hard work and effort, and he had me take him to Home Depot where he

purchased our employees $100 gift cards as a thank you.  Later that day Tier received

and passed the Life Safety/ Generator inspection.

89.    On March 17, 2023, McElroy texted Mr. Ruberry to advise that

Merchants had negotiated a deal with Suffolk.  He stated in the text:

> Ed, Chris McElroy,
>
> Agreed with Suffolk to have Tier removed from phase 2 and the reminder [sic] of phase 1.  Suffolk didn't want a release from damages in phase 1.  I was a bit surprised but we ended up agreeing for a full release and Tier off the project now for 1.65M, which is an addition $50K for our projected costs to complete phase 1.
>
> Working on a release with Suffolk that includes Tier.  Will circulate a draft to you before I give to Suffolk.
>
> I told Marvin I would get Tiers costs to complete the entire project.  Here is what Dan gave me for rough estimates.
>
> 730k tier (38 weeks 12 guys $40/hr)
>
> 500k Conti
>
> 400k JSH

90.    On March 21, 2023, Mr. Mohn emailed McElroy and commented on

the proposed settlement:

> At this point in the process, Tier writes to reserve its rights with respect to the proposed settlement and the agreements related to the Suffolk matter, including the performance bond, the indemnity agreement of September 8, 2021, and the promissory note of February 6, 2023.  We do not request a formal response to the points raised below, other than the striking of the

31

assignment point as indicated and an acknowledgment of receipt. Our suggestion is that matters should be resolved with Suffolk after which Tier and Merchants would resolve their differences without Suffolk's involvement, whether the resolution be in court, arbitration, or mediation. However, there are a number of points that need to be raised up front before proceeding further.

First, we observe that the proposed agreement includes the following provisions:

> "6. In further consideration for the payment set forth above, Obligee does hereby assign, grant, convey, and transfer to Surety, its successors and assigns, up to the amount of the Settlement Amount, any debt, right and/or cause of action it now has for money due against Principal or its successors or assigns relating to the Project for which the Performance Bond was issued."

> "7. . . . Further, this Agreement shall not release or in any way modify any other written agreements or documents executed by Principal, David Hoffman, Jerrilyn Hoffman, and Hoffman Tier Electric LLC for the benefit of Surety. Principal re-affirms the obligations to Surety under the GIA. The GIA and other written agreements between Surety, Principal, David Hoffman, Jerrily Hoffman, and Hoffman Tier Electric LLC shall remain in full force and effect after the complete execution of this Agreement and shall not merge into or otherwise become included within or limited by this Release. Surety reserves all its rights, remedies, claims and defenses against Principal, David Hoffman, Jerrilyn Hoffman, and Hoffman Tier Electric LLC."

As the surety will reserve its rights against Tier and the Hoffmans, Tier and the Hoffmans hereby reserve all their respective rights against the surety. The draft settlement does not include an integration clause, however characterized (e.g., a "merger" clause or a "whole agreement" clause). We do not propose that this reservation of rights be integrated into the settlement, but we will need an acknowledgment of its issuance.

Second, under the proposed settlement, Tier Electric releases Suffolk from any and all liabilities related to the project. Suffolk does not release Tier Electric. Rather, Suffolk assigns its claims against Tier to the surety. Those claims are without value, but you had represented that the releases would be mutual and we had so advised our client. Accordingly, the assignment of claims to the surety must be stricken.

Third, the effect of Tier granting Suffolk a release is that amounts due from Suffolk to Tier will not be paid. Those amounts include outstanding retainage totalling at least $500k. Merchants' decision not to support Tier's completion of the project, which as discussed further below is not justified, means that Tier really has no choice but to provide the requested release of Suffolk. As an evidentiary matter, any litigation with Suffolk would inevitably be prejudiced by Merchants' decision to accept Suffolk's position and agree to the tender of Tier's work to a third party. That decision makes a defense against Suffolk based on Tier's not being in breach untenable. The result of Merchants' decision is that Tier is out of pocket at least $500k in damages. Tier reserves its right to seek recovery of that amount in future litigation.

Fourth, the indemnity agreement provides:

> **"In the event of any payment by the Company, the Undersigned agree that in any accounting between the Company and the Undersigned, the Company shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed".**

(Emphasis added.) We have had several conversations with you about whether Tier Electric was in default under the contract. You have repeatedly said, as recently as this past Thursday, that although Tier's performance has not been perfect, Tier is not in default. It may have been in default when it stopped work in December, but that default has now been cured. In short, as the contracts required, Merchants has duly investigated whether Tier was in default and concluded that Tier was not. Merchants is not acting "under the belief that it is or was liable for the sums or amounts" that it will disburse under the proposed settlement. Accordingly, Tier Electric has no liability to reimburse the payment that Merchants proposes to make. The same point would apply to a subrogation claim brought based on the performance bond itself.

Fifth, we understand from our discussions that Merchants has evaluated the downside position in the event that litigation ensued with Suffolk and determined that it was too great to justify rejecting Suffolk's tender. You indicated that part of the assessment was that even if Tier Electric is not presently in default, Suffolk can be expected to engage in conduct designed to create a future default and then force the hiring of a replacement subcontractor on a time-and-materials basis, whereas presently a replacement contractor can be hired on a fixed-price contract similar to the one with Tier, albeit at a much higher cost that the Tier contract. You further indicated your belief that the

project owner has threatened to terminate Suffolk itself, which could lead to Suffolk claiming material consequential damages.

All of this analysis proceeds from the assumption that Tier is either in default or is likely to be in default at some point in phase II of the project if it is not immediately replaced.  It may be from Merchants' perspective, doing its own internal risk assessment, the proposed settlement is sensible. We do not comment on the point one way or the other. But the point underlying all that analysis is the assumption that Tier is or will be in default.  Tier is not in default, as already discussed, and the supposition that it will be in default, particularly the supposition that Suffolk will succeed in forcing a default through its own nefarious conduct, is not a ground for throwing Tier off the project.  As already discussed, Tier is not presently in default, and without a determination that it is, removing it from the project is unjustified and a breach of the contract between Tier and Suffolk and of the terms of the performance bond and indemnity agreement.

Sixth, Merchants agreed to provide financial support to Tier to ensure Tier could complete the project, as was memorialized in a promissory note executed by Tier and by David Hoffman.  Tier and Mr Hoffman entered into that agreement in reliance on a representation that Merchants would continue to support Tier in continuing to work and complete the project. That representation now appears to have been false.

Seventh, you represented to us that any payments to be made by Tier would be repaid monthly over a period of 6 to 10 years.

For the reasons set forth above, Tier fully reserves its rights, both as to matters stated above and as to any other matters or arguments that are not stated.

As noted at the beginning Tier is willing to execute the settlement subject to all points raised in this letter, including the striking of the assignment, and any additional defenses that may arise as matters progress.

Tier does not agree to any statements made in the settlement agreement, and Merchants cannot assert as an estoppel, waiver, or otherwise the fact that Tier agreed to the release as a defense in any action between the parties.

Once the settlement has been executed, Merchants and Tier can discuss how best to resolve the points raised above and the forum for doing so.

As always, we are happy to discuss at your convenience.

91.     McElroy responded to Mohn's March 21 email on March 22, making it clear that Merchants had shifted its position from supporting Tier as not being in material default to asserting, without justification, that Tier was in default:

Thank you for the response.

As to the first point, the agreement speaks for itself. Tier isn't waiving any rights against Merchants, but it is affirming its responsibility to Merchants. Any proposed changes, including changes that you propose not to put in the agreement are rejected.

Regarding the second point, Suffolk does release Tier. The assignment of any rights from Suffolk to Merchants is standard surety practice and reaffirms Merchants common law right to subrogation as well as its rights under the General Indemnity Agreement (GIA). We will not waive the assignment provision.

Concerning points three, four, and five, Tier is in default. Suffolk has made it abundantly clear that it is looking to Merchants to perform under the bond. Moreover, Tier has made it clear that it cannot perform without Merchants' assistance. Because of this, Merchants has already incurred significant losses because of Tier's failures and breaches. Moreover, your quotation to the GIA failed to include the remaining part of the sentence. I refer you to the GIA as it speaks for itself. Merchants has acted, and will continue to act, in accordance with the rights provided to it under the GIA, common law, and through the promissory note.

As to point six, your statement is false. Merchants provided financial assistance to fulfill its obligations under the bond. We asked the Hoffmans, as the personal indemnitors under the GIA, to resolve in cash flow or short fall issues with Tier. The Hoffmans declined. Merchants reluctantly agreed to a promissory note to allow Tier to repay any loss incurred by Merchants and reaffirm the Hoffman's obligations under the GIA. At this time, due to Tier's failure to perform, the best option for fulfilling our obligations under the bond is through the release agreement with Suffolk.

As to point seven, the promissory note speaks for itself concerning the terms of repayment.

Just today Merchants received notice that Tier and its subcontractor failed to install a BDA communications system in one, or perhaps two buildings. Due to ongoing issues caused by Tier, time is of the essence to execute the release

35

agreement with Suffolk. If Tier will not execute the agreement, Merchants will interpret Tier and the individual indemnitors' refusal as a request under paragraph Second of the GIA to litigate and/or defend Suffolk's claim. Accordingly, Tier and the individual indemnitors are required to deposit with Merchants at the time of their request, cash or an irrevocable letter of credit as collateral satisfactory to Merchants in kind and amount to be used in paying any judgment or judgments rendered, or which might be rendered, against Merchants together with interests, costs and attorneys' fees. In light of the loss Merchants has already suffered and the gravity of the claims alleged by Suffolk, Merchants demands $3,000,000.00 in such collateral. Please advise by 10 am tomorrow whether Tier will execute the release agreement with Suffolk, and if it won't, whether it or the individual indemnitors will provide the demanded collateral. If Tier elects to provide collateral, Merchants requests it does so by this Friday, March 24th by 5:00 pm EST. If Tier and the individual indemnitors refuse to execute the release agreement with Suffolk and refuse to provide the demanded collateral (or if I do not receive a response by 10 am tomorrow), Merchants will proceed with finalizing the agreement with Suffolk utilizing the rights afforded to it under the GIA.

As always we reserve all rights and defenses. Thank you.

92.    On March 23, 2023, Mr. Mohn responded to McElroy in relevant part:

We note your points and also note that you decline to amend the agreement as requested.

Tier will execute the release in the form previously provided, subject to the points stated in my previous email. Our respective emails state our positions and I do not propose to debate them further at this point.

93.    On March 24, 2023, Dan Raglow called Desch and stated that there was a proposed deal on the table that included another contractor finishing the remaining items on Phase I. He stated that Tier needed to have a significant reduction in force and to remove manpower.

94.    On March 28, 2023, Dan Raglow called and stated that there was some miscommunication between Suffolk and Merchants and that Tier was expected to finish Phase I and to bring manpower back on site again. During the conversation

36

Raglow stated that Tier Electric had performed admirably.  He stated that most of the time when the surety gets involved the contractor pushes back and is contentious, but that Tier has stepped up and conducted themselves extremely well and that he was thankful for what we have done.

95.    The source of the "miscommunication" was that Suffolk wanted Tier off the project but the cost of having a substitute contractor for Phase I work was in Merchants' view too high.  As a result, Merchants wanted Tier to finish Phase I at a projected lower cost than was expected from a substitute.

96.    On March 28, 2023, Diaz emailed McElroy with a markup of the proposed settlement.

### (ix)    The settlement

97.    On June 14, 2023, Mr. Mohn emailed McElroy:

Tier Electric has been requested to execute the Agreement and plans to do so upon confirmation from the Surety of the matters set forth in this email. Specifically, Tier wishes to confirm with the Surety that in executing the Agreement, Tier reserves all rights, remedies, claims, and defenses that it may have against Merchants relating to matters subject to the Agreement, including but not limited to any matters being assigned by Suffolk to the Surety.

98.    On June 14, 2023, McElroy responded to Mr. Mohn:

Merchants largely agrees with your interpretation below, but the Agreement speaks for itself.  In particular, paragraph 14 in which the indemnitors reaffirm their obligations to Merchants under the GIA and other written documents. The Agreement does not contain a release by the indemnitors of Merchants, nor does it contain a release by Merchants of the indemnitors.

99.    On June 15, 2023, Tier executed the settlement agreement, captioned the "Performance Bond Release and Assignment."  Suffolk executed the agreement

on June 13, 2023.  Merchants executed the agreement on June 16, 2023.  (The executed contract is hereinafter the "Settlement Agreement," a copy of which is attached as **Exhibit 5**.)

100.    Under the terms of the Settlement Agreement:

    a.  Merchants paid Suffolk $1,834,418.

    b.  Merchants and Tier forfeited "the Subcontract Balance in its entirety." The "Subcontract Balance" was defined as $1,481,950.02, which was the unpaid dedicated subcontract sum for completion of the Project (Phases 1 through 6).

    c.  Upon completion of the remaining Phase 1 work, including "obligations for defective work," Tier's obligations to Suffolk were terminated.

    d.  Other than Payment Bond Obligations, Surety released Tier and Merchants from "all liability or claims it has or may have arising out of or which result from the Subcontract, Project, and/or Performance Bond."

    e.  Suffolk waived all damages that have accrued or could have accrued, based on delay, except that $5,000 per day in damages were agreed in the event that those Phase 1 items listed in Exhibit "A" to the settlement agreement were not complete within 90 days of the effective date of the settlement.

f.  Tier and Merchants released Suffolk and the owner of the Bentley Village project "from any and all liability or claims they have or may have arising out of or which result from the Subcontract." Suffolk provided a parallel release of Tier and Merchants.

g.  Suffolk assigned to Merchants its rights against Tier.

h.  The parties agreed that the agreement did not modify the GIA or other written agreements executed "for the benefit of the surety".

101.   Merchants agreed to the Settlement Agreement and insisted upon Tier joining because it was concerned about potential liability in excess of the penal value of the Performance Bond and the Payment Bond. In short, Merchants was so concerned about the threat of potential bad-faith liability to Suffolk that they were willing to act in bad faith towards Tier.

### (x)   *Post Settlement Developments*

102.   As explained by McElroy to Tier, the powers that be at Merchants had decided that to protect their own exposure — the cost of litigation, consultants, and potential liability for bad faith — leading them not only to settle with Merchants but force Tier to do so. McElroy told Tier that if they did not agree to the settlement then Tier would have to immediately post $3 million in collateral, knowing fully well that Tier lacked the resources to do so. Suffolk, in contrast, recognized that Merchants was not going to fight its demands and acted accordingly. The Settlement Agreement required Tier to finish Phase I and provided funding for Suffolk to replace Tier on Phase II and later phases of the project. Suffolk identified various

items in the later phases that it asserted, wrongly, were part of the Phase I requirements that Tier was to perform.  Merchants then insisted that Tier perform that work even though they were not required to do so under the Settlement Agreement.

103.    Tier completed the Phase I work on Bentley Village within 90 days of the "Effective Date" of the Settlement Agreement, that is, on or before September 11, 2023.  All amounts the Merchants paid Tier after that date — $406,346.87 — were only paid because Suffolk and Merchants insisted upon Tier performing work outside the scope of the Settlement Agreement, except as provided below.

104.    Indeed, the Phase I work would likely have been completed sooner but for the resources diverted, at the insistence of Suffolk and Merchants, from the Phase I work.  Thus, part of the $420,562.96 paid by Merchants to Tier during the 90-day period from June 30, 2023 (the contract Effective Date) through September 11, 2023, was only necessary because of the diversion of Tier resources to perform work for Suffolk and Merchants not required by the Settlement Agreement.

105.    The following table summarizes some of the work that Merchants required Tier to perform that was outside the scope of the settlement agreement:

| | | |
|---|---|---:|
| 1 | #730 Site, Install Site Lighting | 77,529.67 |
| 2 | #1725, Install Light fixtures on ALF roof per owner change directive. | 22,000.00 |
| 3 | #1964, Type H2 Light Fixture Missing | 4,000.00 |
| 4 | #2281 Annunciator panels for fire alarm and generator in wrong location PT Building | 3,000.00 |
| 5 | Page 2, Paragraph 2 of the Agreement | 134,418.00 |
| 6 | Change feeders from Aluminum to Copper | 14,000.00 |
| 7 | Move existing A/C units connected to nonemergency panel to emergency panel | 4,500.00 |
| 8 | Proposed Change Order #23 | 110,457.70 |
| | | 369,905.37 |

106.    Merchants has stated in its Complaint that it paid Suffolk $500,000 in delay damages because Tier did not complete work within the 90-day period. Merchants only made that payment because it treated Phase II work as being within the scope of the Settlement Agreement, which it was not. Plainly, having reached a settlement with Suffolk, Merchants strategy was to agree to whatever Suffolk wanted and then bill Tier for the balance, even though Tier was not responsible for the work and had not been paid for it.

107.    The only Phase I work that was not complete within the 90-day deadline was the installation of a transfer switch related to a generator installed for the project. The delay in installing a single transfer switch was due to its not being delivered on time, notwithstanding that the switch had been ordered from the supplier at the very beginning of the project. Tier installed a temporary switch pending the arrival of the required equipment and installed the required equipment within 2 days of delivery, by October 4-5, 2023. The delivery was completed outside of Tier's control. Suffolk subsequently instructed Tier (and Merchants wrongfully supported Suffolk's instruction) to remove aluminum conductors that were supplying the feed and substitute copper conductors, even though Suffolk had agreed to a cost reduction at the beginning of the project based upon the use of aluminum conductors for feeders.

108.    In March 2022, Tier proposed to Suffolk that a substitute generator and switches be used and sourced for Suffolk from a different supplier as an alternative. The proposal was made because the supplier was not providing a timely delivery of

41

the required generator and switches, and Tier did expect the supplier to ultimately deliver within the project-required timeline. Had Suffolk accepted, the generator and switches would have been delivered 4 months earlier than when they were originally scheduled for delivery. In fact, the delivery of the originally specified generator and switches was delayed 6 months after the date specified in the project timeline. Suffolk declined to accept the proposed substitute generator and transfer switches, preferring to keep its originally specified equipment.

109. On February 22, 2024, Mr. Desch emailed McElroy to advise that Tier was making its first payment on the Promissory Note. Subsequently payments have continued to be timely made.

## COUNT I — DECLARATORY JUDGMENT
## PROMISSORY NOTE

110. Tier and Hoffmann incorporate by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

111. There exists an actual controversy among Tier, Hoffmann, and Merchants concerning whether there is a present breach of the terms of the Promissory Note.

112. Tier and Hoffmann have made all payments required under the Promissory Note.

113. Under the terms of the Promissory Note, absent a non-payment of amounts due thereunder, Merchants has no ground to accelerate the repayment obligations thereunder.

42

114.    Pursuant to 28 U.S.C § 2201, this Court may declare the rights and other legal relations between Tier, Hoffmann, and Merchants, and this Court's declaration shall have the force and effect of a final judgment.

WHEREFORE, Tier and Hoffmann respectfully request that the Court enter judgment in favor of Tier and Hoffmann and against Merchants for a declaration that neither Tier nor Hoffmann is in breach of the Promissory Note.

**COUNT II — DECLARATORY JUDGMENT**
**PROMISSORY NOTE AND GIA**

115.    Tier, Hoffmann, and Jerrilyn Hoffmann incorporate by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

116.    There exists an actual controversy among Tier, Hoffmann, Jerrilyn Hoffmann, and Merchants concerning the effect of the Promissory Note on any obligations under the GIA.

117.    Merchants' claims presume the GIA governs any repayment obligations Tier, Hoffmann, or Jerrilyn Hoffmann might have to Merchants in connection with payments it made under the Payment Bond or the Performance Bond.  Tier, Hoffmann, and Jerrilyn Hoffmann maintain that the Promissory Note governs any repayment obligations.

118.    Tier, Hoffmann, and Jerrilyn Hoffmann seek a declaration that no action can be maintained for recovery under the GIA as long as no default has occurred under the Promissory Note.

119.    As set forth in Count I, Tier and Hoffmann seek a declaration that neither of them is presently in breach of the Promissory Note.

120.    Pursuant to 28 U.S.C § 2201, this Court may declare the rights and other legal relations between Tier, Hoffmann, Jerrilyn Hoffmann, and Merchants, and this Court's declaration shall have the force and effect of a final judgment.

WHEREFORE, Tier, Hoffmann, and Jerrilyn Hoffman respectfully request that the Court enter judgment in favor of Tier, Hoffmann, and Jerrilyn Hoffmann and against Merchants for a declaration that none of Tier, Hoffmann, or Jerrilynn Hoffmann is liable to pay under the GIA unless and until such time as there is a breach of the Promissory Note, and that Tier, Hoffmann, and Jerrilyn Hoffmann are entitled to an award of costs and attorney's fees in this action.

## COUNT III — BREACH OF CONTRACT
## PROMISSORY NOTE

121.    Tier and Hoffmann incorporate by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

122.    The GIA was a valid contract between Tier, Hoffmann, Jerrilyn Hoffmann and Merchants relating to the issuance of bonds and indemnification of Merchants for certain amounts paid under the bonds.

123.    The Promissory Note was a valid contact between Tier, Hoffmann, and Merchants concerning the amount of any indemnity payments under the GIA or otherwise due to Merchants related to the Bentley Village project.

124.    Tier and Hoffmann executed the Promissory Note on the express representation by Merchants that (i) the Promissory Note constituted the terms for the repayment of amounts due from Tier to Merchants under the GIA or otherwise, and (ii) that Merchants would continue to support Tier in continuing to work and complete the project.

125.    Tier and Hoffmann are not in breach of the Promissory Note and continue to make payments as and when they come due under the Promissory Note.

126.    Merchants materially breached the Promissory Note by demanding payment of amounts allegedly owed under the GIA or otherwise notwithstanding having agreed to accept the amounts provided by the Promissory Note in lieu of the balance owed under the GIA or otherwise.

127.    As a result of Merchants' breach of the Promissory Note, Tier and Hoffmann suffered damages in an amount that exceeds $75,000 exclusive of interest and costs.

WHEREFORE, Tier and Hoffmann respectfully request that the Court enter judgment in favor of Tier and Hoffmann and against Merchants for compensatory damages, prejudgment interest, and costs.

## COUNT IV — FRAUD
## INDUCEMENT TO EXECUTE PROMISSORY NOTE

128.    Tier and Hoffmann incorporate by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

129.   Chris McElroy, on behalf of Merchants, represented to Tier and Hoffmann that the purpose and intent behind the Promissory Note was to define the terms of repayment of any and all obligations that Tier or the indemnitors of the GIA (David and Jerrilyn Hoffmann) might have under the GIA.

130.   McElroy further represented that Merchants would continue to support Tier in continuing to work and complete the project.  He represented that the execution of the Promissory Note was a precondition to Merchants making efforts to resolve the dispute with Suffolk, and, following execution of the Promissory Note, Merchants entered into negotiations with Suffolk that eventually led to a settlement.

131.   McElroy made the representations with the intent of inducing Tier and Hoffmann to execute the Promissory Note and with the knowledge that Tier and Hoffmann would rely upon that representation in executing the Promissory Note. He further made the representations with the intent to reach a monetary settlement with Suffolk that would involve terminating Tier's participation on the project.

132.   Merchants never intended to continue to support Tier in continuing to work and complete the project.  Its intent at the time of the Promissory Note was to secure Tier's agreement and then reach settlement terms with Suffolk that would terminate any further involvement of Tier on the project.

133.   Tier and Hoffmann executed the Promissory Note in reliance upon the intentional misrepresentations made by McElroy on behalf of Merchants.

134.   In the event it is concluded that the Promissory Note did not supplement the repayment terms of the GIA, as represented by McElroy to Tier, then

46

Merchants is liable for fraud in inducing Tier and Hoffmann to execute the Promissory Note.

135.    But for the execution of the Promissory Note, no settlement agreement with Suffolk would have been negotiated and executed and the amounts Tier had to forfeit as a result of Merchants' interference in Tier's contractual relationship with Suffolk would not have been forfeited, nor would the other damages Tier incurred laid out elsewhere in this document have been incurred including the ruination of Tier's overall business worth at least $3,107,415.

WHEREFORE, Tier and Hoffmann respectfully request that the Court enter judgment in favor of Tier and Hoffmann and against Merchants for compensatory damages, prejudgment interest, costs, and punitive damages.

## COUNT V — DECLARATORY JUDGMENT
## GIA, SETTLEMENT AGREEMENT, AND PROMISSORY NOTE

136.    Tier, Hoffmann, and Jerrilyn Hoffmann incorporate by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

137.    There exists an actual controversy among Tier, Hoffmann, Jerrilyn Hoffmann, and Merchants concerning the amounts due to Merchants under either the GIA or the Promissory Note as a result of the Settlement Agreement and of Tier's performance under the Subcontract.

138.    Tier was never in material default of its obligations to Suffolk under the Subcontract Agreement and therefore no amounts were due to Suffolk at the time of the Settlement Agreement.

139.    Accordingly, the assignment to Merchants of Suffolk's rights under the GIA is of no value because no amounts were ever due from Tier to Suffolk under that agreement.

140.    For the same reasons, the amount paid by Merchants to Suffolk under the Settlement Agreement ($1,834,418) cannot be recovered by Merchants from Tier, Hoffmann, or Jerrilyn Hoffmann because those amounts were paid by Merchants notwithstanding that they were not due to Suffolk under the Subcontract Agreement.

141.    Merchants disputes these legal relations, claiming that it can recover the $1,834,418 paid to Suffolk under the Settlement Agreement.

142.    Pursuant to 28 U.S.C § 2201, this Court may declare the rights and other legal relations between Tier, Hoffmann, Jerrilyn Hoffmann, and Merchants, and this Court's declaration shall have the force and effect of a final judgment.

WHEREFORE, Tier, Hoffmann, and Jerrilyn Hoffmann respectfully request that the Court enter judgment in favor of Tier, Hoffmann, and Jerrilyn Hoffmann and against Merchants for a declaration that the $1,834,418 Merchants paid to Suffolk under the Settlement Agreement cannot be recovered from Tier, Hoffmann, or Jerrilyn Hoffmann whether under the GIA, under the Promissory Note, under the Settlement Agreement, or under any other contract or legal theory that may be asserted by Merchants, and that the principal balance due under the Promissory Note should be adjusted to exclude the $1,834,418 payment, as well as any other amounts that may be identified and proved at trial, and that Tier, Hoffmann, and Jerrilyn Hoffmann are entitled to an award of costs and attorney's fees in this action.

## COUNT VI — DECLARATORY JUDGMENT
## GIA, SETTLEMENT AGREEMENT, AND PROMISSORY NOTE

143.    Tier, Hoffmann, and Jerrilyn Hoffmann incorporate by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

144.    There exists an actual controversy among Tier, Hoffmann, Jerrilyn Hoffmann, and Merchants concerning the amounts due to Merchants under either the GIA or the Promissory Note as a result of the Settlement Agreement and of Tier's performance under the Subcontract.

145.    Tier was never in material default of its obligations to Suffolk under the Subcontract Agreement and therefore no amounts were due to Suffolk at the time of the Settlement Agreement.

146.    The delay damages paid under the Settlement Agreement ($500,000) cannot be recovered, whether under the GIA, the Promissory Note, or otherwise, because those amounts were paid by Merchants notwithstanding that they were not due to Suffolk under the Subcontract Agreement.

147.    Suffolk was not entitled to delay damages under the Settlement Agreement or any other agreement because the delay was principally caused by Suffolk, by other contractors of Suffolk, or performance was impossible due to equipment being untimely supplied by third-party suppliers that Suffolk required Tier to use.  Merchants' claim for delay damages ($500,000) cannot be recovered.

148.    Merchants disputes these legal relations, claiming that it can recover the delay damages purportedly paid under the Settlement Agreement.

49

149.    Pursuant to 28 U.S.C § 2201, this Court may declare the rights and other legal relations between Tier, Hoffmann, Jerrilyn Hoffmann, and Merchants, and this Court's declaration shall have the force and effect of a final judgment.

WHEREFORE, Tier, Hoffmann, and Jerrilyn Hoffmann respectfully request that the Court enter judgment in favor of Tier, Hoffmann, and Jerrilyn Hoffmann and against Merchants for a declaration that the balance due on the Promissory Note or under the GIA does not include the $500,000 paid to Suffolk in delay damages, or any other amounts that may be identified and proved at trial, and that Tier, Hoffmann, and Jerrilyn Hoffmann are entitled to an award of costs and attorney's fees in this action.

## COUNT VII — BREACH OF CONTRACT
## PERFORMANCE BOND AND PAYMENT BOND

150.    Tier incorporates by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

151.    Under the terms of the Performance Bond and the Payment Bond, Merchants' obligations to Suffolk were conditioned upon Tier being in material default under the Subcontract.  The determination of whether such a default existed was subject to the implied duty of good faith and fair dealing.

152.    Merchants breached its duties under the bonds by treating Tier as being in default under the Subcontract Agreement when it was not in default.

153.    As a result of Merchants' breach, the Tier business was ruined, resulting in a loss equal to the value of the business, which was at least $3,107,415.

154.    Also as a result of Merchants' breach combined with Merchants' threat that they would no longer provide financial support if Tier failed to execute the Settlement Agreement, Tier entered into the Settlement Agreement resulting in forfeiture of amounts owed by Suffolk to Tier in an amount in excess of $1.4 million.

WHEREFORE, Tier respectfully requests that the Court enter judgment in favor of Tier and against Merchants for compensatory damages in an amount in excess of $4.5 million, prejudgment interest, costs, and attorney's fees.

## COUNT VIII — DECLARATORY JUDGMENT
### GIA

155.    Tier, Hoffmann, and Jerrilyn Hoffmann incorporate by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

156.    There exists an actual controversy among Tier, Hoffmann, Jerrilyn Hoffmann, and Merchants concerning whether the work done by J.S. Held, LLC and Conti, LLC is properly recoverable from Tier, Hoffmann, or Jerrilyn Hoffmann under the terms of the GIA.

157.    In the course of the Bentley Village project, Merchants hired a consultant, J.S. Held, LLC, to assist in its monitoring of the project and adjustment of any surety.  The work done by the consultant was principally to assist Merchants in its adjustment of the potential loss on the Bentley Village project.  J.S. Held then retained services of Conti, LLC to assist.

158.    Merchants did not face a loss absent a material default by Tier on the project.

51

159.    Tier was not in material default on the project.

160.    None of the work done by J.S. Held, LLC or Conti, LLC is properly billed to Tier under the GIA.

161.    Accordingly, at least $237,558.44 of the amount asserted as being due and owing under the GIA is not in fact due.

162.    Pursuant to 28 U.S.C § 2201, this Court may declare the rights and other legal relations between Tier, Hoffmann, Jerrilyn Hoffmann, and Merchants, and this Court's declaration shall have the force and effect of a final judgment.

WHEREFORE, Tier, Hoffmann, and Jerrilyn Hoffmann respectfully request that the Court enter a declaratory judgment in favor of Tier, Hoffmann, and Jerrilyn Hoffmann and against Merchants that the amount due, if any, under the GIA should be reduced by at least $237,558.44 and such additional amounts as may be proved at trial, and that Tier, Hoffmann, and Jerrilynn Hoffmann are entitled to an award of costs and attorney's fees in this action.

## COUNT IX — DECLARATORY JUDGMENT
## PROMISSORY NOTE

163.    Tier and Hoffmann incorporate by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

164.    There exists an actual controversy among Tier, Hoffmann, and Merchants concerning whether the work done by J.S. Held, LLC and Conti, LLC is properly recoverable from Tier or Hoffmann under the terms of the Promissory Note.

165.    The $237,558.44 asserted as due from Tier, Hoffmann, and Jerrilyn Hoffmann under the GIA forms part of the principal balance allegedly due under the Promissory Note.

166.    Because the $237,558.44 is not due under the GIA, as asserted in Count VIII, it is not properly included in the principal balance purportedly due and owing under the Promissory Note.

167.    Pursuant to 28 U.S.C § 2201, this Court may declare the rights and other legal relations between Tier, Hoffmann, Jerrilyn Hoffmann, and Merchants, and this Court's declaration shall have the force and effect of a final judgment.

WHEREFORE, Tier and Hoffmann respectfully request that the Court enter a declaratory judgment in favor of Tier and Hoffmann and against Merchants that the amount due under the Promissory Note should be reduced by at least $237,558.44 and such additional amounts as may be proved at trial, and that Tier and Hoffmann are entitled to an award of costs and attorney's fees in this action.

## COUNT X — BREACH OF CONTRACT
## SETTLEMENT AGREEMENT

168.    Tier incorporates by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

169.    Section 5 of the Settlement Agreement provided: "Upon payment of the Settlement Amount and completion of the Phase 1 items, the Principal's obligations under the Subcontract and the Surety's obligations under the Performance Bond,

including but not limited to obligations for defective work, Phase 1 Items, and warranty work are extinguished."

170.    Any obligations of Tier to perform work on phases of the Bentley Village project subsequent to Phase I were terminated by the Settlement Agreement.

171.    Suffolk and Merchants required Tier to do additional work not within the parameters of section 5 of the Settlement Agreement, in breach of the terms of the Settlement Agreement.  In particular, they required Tier to do Phase II work that was not part of Phase I.

172.    Tier suffered damages as a result of Merchants' breaches of its contract with Tier including but not limited to all payments made by Merchants to Tier, and claimed by Tier, subsequent to the date that Phase I of Tier's work had been completed, which was on or before September 11, 2023.  Those constitute at least $406,346.87.  That is inclusive of at least $369,905.37 that Tier would have received had the Phase II work been billed and paid for.

WHEREFORE, Tier respectfully requests that the Court enter judgment in favor of Tier and against Merchants for compensatory damages in the amount of $406,346.87 or such amount of compensatory damages as may be proved at trial, prejudgment interest, costs, and attorney's fees.

## COUNT XI — UNJUST ENRICHMENT UNCOMPENSATED WORK

173.    Tier incorporates by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

54

174.   After the Settlement Agreement became effective, Suffolk and Merchants insisted that Tier perform work, without compensation, that Tier had no duty to perform under the Settlement Agreement.

175.   The work performed by Tier, at the insistence of Suffolk and Merchants, conferred a benefit on Suffolk and Merchants.  In the case of Merchants, it voluntarily provided the additional services to Suffolk, to which Suffolk was not entitled, to avoid further disputes with Suffolk and avoid legal expense.

176.   Merchants knew it was receiving the benefit, having insisted that Tier provide it.  By insisting upon the service, Merchants voluntarily accepted the service, and Merchants retained the benefit conferred (in particular, the avoidance of a dispute with Suffolk and expenses related thereto).

177.   In the circumstances, it would be inequitable for Merchants to retain the benefit of Tier's services outside the scope of the Settlement Agreement without paying for it.

178.   The value of the services for which Tier seeks payment is at least $369,905.67.

WHEREFORE, Tier respectfully requests that the Court enter judgment in favor of Tier and against Merchants for an amount equal to the benefit of uncompensated work of at least $369,905.67, prejudgment interest, costs, and attorney's fees.

## COUNT XII — UNJUST ENRICHMENT
## SUBCONTRACT BALANCE

179.    Tier incorporates by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

180.    Immediately prior to the Settlement Agreement, the balance on the Subcontract (the amount Suffolk owed Tier) was $1,481,950.01 ("Subcontract Balance").

181.    The Settlement Agreement comprised an agreement by Merchants to pay the amounts supposedly due to Suffolk under the Performance Bond and comprised a payment $1,834,418.000 and the Subcontract balance of $1,481,950.01. The forfeiture by Tier of the Subcontract Balance was a payment by Merchants of amounts allegedly due to Suffolk under the Performance Bond.  As such, the forfeiture of the Subcontract Balance was the payment by Tier of a debt supposedly due from Merchants to Suffolk.

182.    Tier further was obligated to pay for materials and expenses required to complete the Phase 1 work specified in the Settlement Agreement, for which Tier was not reimbursed, in an amount of at least $56,134.94.

183.    Tier's forfeiture of the Subcontract Balance and supplying of materials conferred a benefit on Merchants, and Merchants as a party to the Settlement Agreement had knowledge that the benefit was conferred.

184.    Merchants voluntarily accepted and retained the benefit of Tier's forfeiture of the Subcontract Balance and supplying of materials.

185.    In the circumstances, in particular where Tier was not in material default on the Subcontract and Merchants acknowledged as much to Tier throughout

56

the period leading to the execution of the Settlement Agreement, it would be inequitable for Merchants to retain the benefit of the forfeiture of the Subcontract Balance and supplying of materials.

186.    Tier seeks payment from Merchants of the entire forfeited Subcontract Balance and uncompensated materials.

WHEREFORE, Tier respectfully requests that the Court enter judgment in favor of Tier and against Merchants for the amount of benefit Merchants received unjustly, being at least $1,538,084.96, prejudgment interest, costs, and attorney's fees.

## COUNT XIII — INTENTIONAL INTERFERENCE WITH CONTRACT
## SUBCONTRACT BETWEEN SUFFOLK AND TIER

187.    Tier incorporates by reference, as though fully set forth herein, the allegations in paragraphs 1 through 109.

188.    The Subcontract was a valid contract between Tier and Suffolk.

189.    Merchants was aware of the existence of the Subcontract.

190.    Merchants negotiated the Settlement Agreement on terms that required Tier to forfeit its rights against Suffolk.  The foreseeable result of the Settlement Agreement was that Suffolk failed to perform its obligations to Tier, and Tier lost the benefit of the Subcontract Balance.

191.    As a result of the Settlement Agreement, Tier was forced to close its business resulting in a loss to its owners equal to the value of that business.

192.    Merchants lacked justification for its inducement of Suffolk's breach because it knew that Tier was not in material default of the Subcontract.

WHEREFORE, Tier respectfully requests that the Court enter judgment in favor of Tier and against Merchants for compensatory damages, prejudgment interest, costs, and attorney's fees.

## **DEMAND FOR JURY TRIAL**

Defendants/Counterclaim Plaintiffs demand, pursuant to Local Rule 1.09 and Fed. R. Civ. P. 38, trial by jury of all issues so triable.

Date:  February 25, 2025                    Respectfully submitted,

                                           By: */s/ Hector R. Rivera*
                                               HECTOR R. RIVERA
                                               Quintairos, Prieto, Wood & Boyer, P.A.
                                               9300 South Dadeland Boulevard, 4th
                                               Floor
                                               Miami, Florida 33156
                                               Ph: (305) 670-1101 x1012
                                               Fax: (305) 670-1161
                                               E-Mail: hrivera@qpwblaw.com
                                               *Counsel for Defendants, David H. Hoffmann,*
                                               *Jerrilyn M. Hoffmann, Tier Electric of*
                                               *Central Florida, Inc., and Hoffmann Tier*
                                               *Electric, LLC*


                                               Edward F. Ruberry
                                               ed.ruberry@ruberry-law.com
                                               Stuart M.G. Seraina
                                               stuart.seraina@ruberry-law.com
                                               Ruberry Stalmack & Garvey, LLC
                                               300 South Wacker Drive, Suite 3250
                                               Chicago, Illinois  60606
                                                (312) 466-8050

                                               Michael H. Moirano
                                               mmoirano@mgklaw.com
                                               MGK LAW
                                               Moirano Gorman Kenny, LLC
                                               300 S. Wacker Drive, Suite 3250
                                               Chicago, Illinois 60606
                                               (312) 614-1260

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of February, 2025, I caused the electronic submission of the forgoing FIRST AMENDED COUNTERCLAIM, to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic filing to the following CM/ECF registrants:

Robert C. Graham, Jr., Esq.
Florida Bar No. 105951
Paskert Divers Thompson
100 North Tampa Street, Suite 3700
Tampa, FL 33602
rgraham@pdtlegal.com
*Counsel for Merchants National Bonding, Inc.*

/s/ Hector R. Rivera
*Counsel for Defendants, David H. Hoffmann, Jerrilyn M. Hoffmann, Tier Electric of Central Florida, Inc., and Hoffmann Tier Electric, LLC*